UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

DARRYL RICHARDSON,           )     Case No. 3:11CV1217
                                 )
         Petitioner,       )     JUDGE CHRISTOPHER A. BOYKO
                                 )
     v.                  )     Magistrate Judge George J. Limbert
                                 )
KEITH SMITH, WARDEN TOLEDO    )     **REPORT AND RECOMMENDATION**
CORRECTIONAL INSTITUTION,      )     **OF MAGISTRATE JUDGE**
                                 )
        Respondent.      )
                                 )

On June 2, 2011[1], Petitioner Darryl Richardson ("Petitioner"), acting *pro se*, filed a petition for a writ of  habeas corpus pursuant to 28 U.S.C. §2254.  ECF Dkt. #1.  Petitioner seeks relief for alleged constitutional violations that occurred during his trial in the Lucas County, Ohio Court of Common Pleas, where he was convicted of one count of aggravated murder in violation of Ohio Revised Code ("ORC") §2903.01(A) and (F). ECF Dkt. #16-5 at 165[2].  On January 30, 2012, Respondent Keith Smith, Warden of the Toledo Correctional Institute ("Respondent"), where Petitioner is incarcerated, filed an answer/return of writ. ECF Dkt. #13.  Petitioner filed his traverse on July 16, 2012.  ECF Dkt. #25.  For the following reasons, the undersigned RECOMMENDS that the Court DISMISS the petition in its entirety with prejudice:

I.     **SYNOPSIS OF THE FACTS**

The Sixth District Court of Appeals of Ohio set forth the relevant facts on direct appeal. ECF Dkt. #18-4 at 391-402. These binding factual findings "shall be presumed to be correct," and Petitioner has "the burden of rebutting the presumption of correctness by clear and convincing

---

[1]The filing date for a petition from an incarcerated *pro se* petitioner is the date the petition was handed over to the prison mail system, not the date it was received and docketed by the federal habeas court. *Houston v. Lack*, 487 U.S. 266, 270-72, 108 S.Ct. 2379, 101 L.Ed.2d 245 (1988).

[2]  Page numbers in this report and recommendation refer to the Page ID# in the electronic filing system.

evidence." 28 U.S.C. §2254(e)(1); *Warren v. Smith*, 161 F.3d 358, 360-61 (6th Cir. 1998), *cert. denied*, 119 S.Ct. 2403 (1999):

On August 18, 2006, Toledo police were summoned to Toledo Spain Park at approximately 1:00 a.m., to investigate a report that a woman had been badly beaten and was lying on the ground in the park. By the time police arrived the victim, Lori Rivera, was being taken to St. Vincent's Hospital. While looking for evidence in the neighborhood, Toledo Police Officer Theresa Sanders noticed a man sitting on the front steps of a nearby apartment complex known as Executive Towers. The man, who identified himself as appellant, Darryl Richardson, told Officer Sanders that he was looking for his girlfriend. Appellant's description of his girlfriend matched that of Rivera.

Appellant let Sanders and Toledo Police Department Detective Scott Smith into Rivera's apartment to look for Rivera's cell phone. Upon entering the apartment, officers noticed a telephone that was broken in half, lying on the floor. Detective Smith also noticed blood on appellant's cheek, and what appeared to be blood on the bathtub.

Seven hours after she was taken to the hospital, Lori Rivera died. On August 28, 2006, the Lucas County Grand Jury indicted appellant on one count of aggravated murder, in violation of R.C. 2903.01(A). On October 16, 2006, the state filed a "Notice of Intent to Use Evidence," pursuant to Evid. R. 12(D). The evidence in question related to a reported incident in May 2006, during which police intervened in an altercation between appellant and Rivera at Rivera's apartment. Appellant filed a motion to suppress evidence of the altercation on October 31, 2006. On November 2, 2006, appellant filed a motion to exclude any evidence related to other crimes, wrongs, or acts not directly related to the incident that led to Rivera's death.

The state filed a response to appellant's motion to suppress on December 12, 2006. A motion to supplement the state's response was filed on January 16, 2007. On January 23, 2007, appellant filed a supplement to his motion to suppress. On March 6, 2007, appellant filed a second motion to exclude evidence of other crimes, wrongs, or acts. On March 22, 2007, the state filed a second notice of its intent to use evidence of an incident that occurred on April 27, 2006, involving appellant and Rivera.

A jury trial was held from April 30 to May 3, 2007, at which testimony was presented by 21 witnesses on behalf of the prosecution. Executive Towers resident Kenneth Harris testified that he saw a person in the park, wearing a white T-shirt and dark pants and with what looked like a short ponytail, hitting the ground with a blunt object at approximately 12:30 a.m. on August 18, 2006. Harris said he saw that same person leave the park and walk toward Executive Towers, after which Harris went to the park and saw a person lying on the ground, bleeding.

Another Executive Towers resident, Joe Jaris, testified that he saw a woman lying on the ground in Toledo Spain Park, with a man standing over her, at about 12:30 a.m. Jaris stated that the man, who was wearing light-colored khaki pants and had dark skin, had his arms raised as if he was "tending to someone who was harmed." Jaris' girlfriend, Amanda Whittington, testified that she arrived home at approximately 12:50 a.m. and saw a person lying on the sidewalk in the park. The person lifted his or her head and put it back down.

Executive Towers resident Jignesh Patel stated that [sic] was talking on his cell phone around 12:45 a.m. as he returned home from seeing a movie. Patel did not testify that he saw anything in the park. Resident Keisha Serrant testified that she came home to her apartment at approximately 12:30 a.m.

Officer Sanders testified at trial that she arrived at the park after 1:00 a.m. on August 18, 2006, and observed bloody clumps of hair and "all kinds of blood around the [victim's] body." In addition, some of Rivera's clothing was missing and she appeared to have been "very badly beaten." Sanders stated that when she saw appellant sitting on the front steps of Executive Towers, he was wearing jeans, a T-shirt, and dark sweatshirt, even though the weather was very warm. Appellant told Sanders he had an argument with his girlfriend, whose description closely matched that of Rivera. Sanders knew appellant was describing Rivera when he accurately described the tattoos on his girlfriend's body. Sanders also testified that, when appellant let the officers into his apartment, they observed a broken telephone on the floor; otherwise, the one bedroom apartment was orderly.

Toledo Police Officer Michelle Roush testified that she went to Executive Towers at the request of her partner, Officers Sanders. Roush stated that appellant let officers into the building by using a key fob.

Toledo Police Detective Steve Applin testified that he went into the apartment, where he observed red spots on the bathtub. Applin also noted that appellant had blood on his face, and he told appellant not to clean the blood off. On cross-examination, Applin stated that appellant was not wearing a white shirt or light pants at the time, and there was no blood on appellant's clothes. On redirect, Applin testified that he did not test the shower drain for blood.

Toledo Police Detective Scott Smith testified at trial that Rivera had already been taken to the hospital when he arrived at the scene, where he observed clumps of hair within a 20-foot radius. Smith stated that he was still processing the crime scene several hours later when he was asked to come up to Rivera's apartment, where he observed blood on appellant's face. Over the objection of the defense, Smith testified that he has processed hundreds of crime scenes involving blood evidence, after which he proceeded to explain the concept of "blood spatter" for the jury. Smith stated that appellant had a substance on his cheek, under his eye, on his chin, and behind his right ear, which later was found to be blood. Smith further testified that, in his opinion, the blood on appellant's face was the result of the medium-to-high velocity impact of blood "spattering."

On cross-examination, Smith testified that he did not collect evidence from the tub drain, and no blood was found on appellant's clothes. Smith stated that he did not do field tests on the swabs from appellant's face, because the test would have used up the relatively small samples.

Toledo Police Officer Duane Poole testified that he was called to the intersection of Front and Main Streets in East Toledo on April 27, 2006, where he observed a female "stumbling" in the street. Poole stated that the woman, Lori Rivera, was bleeding from her nose, mouth and head, and appeared confused and upset. Over objection, Poole testified that Rivera told him that her boyfriend, named "Dee" or "Dean" had "beat her up; " however, Rivera was uncooperative in the investigation and refused medical treatment for her injuries. Poole also stated that Rivera's mother told him Rivera's boyfriend was "Dean Thomas."

Toledo Police Sergeant Norman Giesige testified that, on May 23, 2006, he responded to a call involving a domestic disturbance at 718 Chestnut Street. Upon arrival, Giesige heard a women crying inside the residence, and a male voice saying: "I own you bitch. I'll kill you. I'll bash your f------g skull in" Giesige stated that police broke the door down, and found Rivera, covered in blood and holding appellant at bay with a knife. Upon seeing the police, Rivera said: "Man, I'm glad you guys came because he would have killed me." Appellant responded: "You [police] ain't got nothin on me. I ain't got no blood on me." Giesige testified that, ultimately, charges against appellant were dropped because Rivera did not come to court.

Rivera's mother, Barb Najmi, testified that her daughter was living with appellant, who was also known as "Dee Thompson," at the time of her death. Najmi also testified that on April 27, 2006, Rivera was beaten, after which she had "stomp marks" on her head and face. Najmi also testified that she helped her daughter move into Executive Towers, which had around-the-clock security, to get away from appellant after the incident on May 23, 2006. On cross-examination, Najmi testified that she never saw appellant hit her daughter. Najmi also testified that Rivera had a fight with another female on a prior occasion, during which the woman "jumped" Rivera and hit her.

Rivera's friend, Mary Clark, testified that on August 17, 2006, she was talking to Rivera on the telephone about Rivera coming to her house for a visit. Clark stated that, during the conversation, she heard appellant say: "Bitch, you ain't going nowhere. You go anywhere, I'll kill you." On cross-examination, Clark stated that she never met appellant in person; however, she recognized his voice from talking to him on the phone. Clark also stated that Rivera had a fight with another woman, and that Rivera previously had a "rocky" relationship with a man named Jose.

Jennifer Losey, another friend of both Rivera and Clark, testified that she had a telephone conversation with Rivera on August 17, 2009[sic], at about 10:30 p.m., about an upcoming trip with Rivera to Cedar Point amusement park. Losey said that, during that conversation, she heard appellant in the background saying in an angry tone: "I'm going to f-----g kill you tonight, bitch, if I have to throw you off the balcony." On cross-examination, Losey testified that she gave the police her cell phone number so they could check the time of her call to Rivera.

Ann Broderick, another friend of Rivera, testified that she last saw Rivera on Tuesday of the week that Rivera died. However, she was unable to speak to Rivera on August 17 because her phone was out of order.

Toledo Police Officer Mark Johnson testified that he reviewed surveillance tapes from three cameras that recorded events at the lobby area, front entrance and workout room of Executive Towers on August 17 and 18, 2006. Johnson stated that he interviewed Patel and Serrant, and used Patel's cell phone records and a stopwatch to isolate events around the time of the attack on Rivera. Johnson testified that the tape shows someone sitting on the front steps of the building when police arrived at 1:08 a.m. He further testified that the tapes show appellant entering the building with Rivera at 10:52 p.m., leaving one hour later, and walking with Rivera across the parking lot. Later, at 12:15 a.m., they show appellant coming back, going into the building for three minutes, then leaving again. This time, appellant returned after 27 minutes, shortly before police arrived on the scene. Both times, appellant entered the building wearing a white FUBU brand T-shirt with a distinctive logo on the front. However, at 12:52 a.m., after the attack on Rivera, someone in a dark hooded sweatshirt left the building carrying a plastic bag. Shortly thereafter, a person

-4-

wearing dark colored clothes sat down on the front steps.  That person later proved to be appellant.

On cross-examination, Johnson stated that his timeline depends on Patel's testimony. Johnson further stated that he could not tell from the tapes if there was blood on appellant's face or on his white FUBU shirt.

Janelle Barker, the property manager of Executive Towers, testified that the front doors of the building are always locked, and residents can only access the building by using a key or a key fob.  Barker further testified that appellant did not have his own key fob, because he was not on the lease to Rivera's apartment.  Barker stated that Rivera had a swollen, bruised face, that looked like she had been in a "severe car accident," the day she came in with her mother to rent the apartment.  Barker further stated that appellant, who lived in the apartment with Rivera, always wore a white FUBU jersey and a hat on backwards.  She said four complaints for domestic disturbances, including yelling and screaming, had been lodged regarding apartment 511, Rivera's apartment, since Rivera moved in.  When she spoke to Rivera about the noise, Rivera stated that she and appellant had a rocky relationship and they were working it out.

Toledo Police Detective Denise Muszynski testified that she was called to Toledo Spain Park at 2:30 a.m. on August 18, 2006, after Rivera had been taken to the hospital.  After staying at the scene for 45 minutes, Muszynski went to the police station to interview appellant.  She stated that appellant was wearing dark pants, a dark sweatshirt and boots, even though it was hot outside.  Muszynski further stated that she read appellant his Miranda rights at around 5:20 a.m., after which he agreed to talk.  During a one-hour interview, appellant stated that his relationship with Rivera was "rocky."  He also told Muszynski that Rivera was abusive and always "picking at him to argue."  Muszynski said that appellant told her he and Rivera fought on the night of August 17, after which they made up and went outside for a walk.  Five to ten minutes later, they returned home, and Rivera went back out to get beer.  When she did not return, appellant went looking for her for about 35 minutes. Appellant told Muszynski that it was after he came back from looking for Rivera that he first saw police in the park.  Muszynski testified that appellant said he wore the same dark clothes all day.

Muszynski stated that police did not find a baseball hat or FUBU jersey in Rivera's apartment.  She also stated that appellant had blood on his face when she first saw him in the apartment, which he explained by saying that Rivera had slapped him and caused his nose to bleed.

On cross-examination, Muszynski testified that appellant was cooperative with police, and that he signed a waiver for the original search of the apartment.  Muszynski also testified that there was no sign of a struggle in the apartment, and the only substances that looked like blood were on appellant and bathtub.  She stated that appellant explained that there were scratches on his hands "because he is a working man."  Muszynski further stated that appellant did not have a ponytail at the time of the interview.  She said no attempt was made to locate Jose, Rivera's former boyfriend.

On re-cross, Muszynski recapped Harris' and Jaris' testimony that the man in the park was wearing a light shirt, as well as Harris' statement that the man was wearing dark pants and had a ponytail, and Jaris' conflicting statement that the man was wearing dark pants.  Muszynski testified that video from the surveillance tapes indicated appellant changed his clothes from light to dark after Rivera left the apartment for the last time.

Lucia Hinojosa, Ph.D., a clinical psychologist specializing in forensics, testified at trial as to the nature of Battered Women's Syndrome ("BWS"). Specifically, Hinojosa testified that BWS is an anxiety disorder, similar to Post-Traumatic Stress Disorder, which involves a cycle of violence in which there is a phase where tension builds up, followed by physical and/or verbal and mental abuse, and ending in excuses, apologies, and attempts to make amends by the abuser. She further testified that, in order to be classified as a battered woman, there has to be at least two cycles of such battering. Hinojosa explained to the jury that, in cases of BWS, the victim gives up control to the abuser in an attempt to stem the abuse. The result is a state of "learned helplessness," in which the victim refuses to walk away from the abusive relationship, even if they are outwardly able to do so, and in spite of the consequences of staying. Hinojosa stated that it is common for victims of BWS to refuse to cooperate with police.

On cross-examination, Hinojosa testified that she never interviewed Rivera, and her testimony was not specific to this case. At that point, an off-the-record discussion was held, at which the defense objected to Hinojosa's testimony, on grounds that, pursuant to R.C. 2901.06, BWS testimony may only be used by the defendant, and only in cases involving claims of self-defense or insanity. The prosecution responded that BWS testimony was being offered to explain that "[BWS] does in fact exist for whatever purpose the jury wants to put forth for the facts of this case." Thereafter, the trial court overruled the objection and the trial resumed.

Lindsey Hail, forensic scientist at the Ohio Bureau of Criminal Investigation, testified that she analyzed the samples collected at the crime scene and from Rivera's body, which included two rape kits, DNA and fingernail clippings from Rivera and appellant, swabs from appellant's face and the bathtub, and a dollar bill found in appellant's shoe. Hail stated that the swab of appellant's cheek and chin contained both his and Rivera's DNA; however, appellant was the major contributor, while swabs of the bathtub contained a mix of both Rivera's and appellant's DNA. She also stated that Rivera was the major contributor of DNA on the swab from behind appellant's ear; which the major contributor of DNA on the dollar bill was an unknown male. Hail further stated that it was reasonable to find appellant's DNA on his own face, and she could not say whether Rivera's DNA came from body fluids of skin cells that sloughed off during intimate contact.

Deputy Lucas County Coroner Diana Scala-Barnett, MD, testified there were more than 40 injuries to Rivera's body; however, the likely cause of death was a massive blow to the head by a square instrument. Scala-Barnett also testified that Rivera was hit so hard the orbital bone around one of her eyes was shattered, and her eyeball was ruptured. In addition, Rivera's jaw and teeth were fractured, her neck was bruised, and she had bruises on the back of her head and on her shoulders, as well as defensive wounds on her arms and hands. There were also bruises on her legs and thighs and genital area. Scala-Barnett stated that Rivera's death was a homicide caused by "craniocerebral injuries * * * due to beating."

On cross-examination, Scala-Barnett testified that some of Rivera's bruises were older, and not all of the injuries appeared to be caused by a squared-off, blunt instrument. She also testified that Rivera lost a lot of blood in the attack, and it would be reasonable to find blood spatter on her attacker. Finally, Scala-Barnett stated that Rivera had the name "Jose" tattooed on her neck.

At the conclusion of Scala-Barnett's testimony, the state rested. Defense counsel made a motion for acquittal pursuant to Crim. R. 29, which was denied. No testimony was presented by the defense. Closing argument were then presented by

> both parties, after which the case was given to the jury.  Three hours later, the jury unanimously found appellant guilty of aggravated murder, as charged in the indictment.

ECF Dkt. #18-4 at 390-402.

## II.    **PROCEDURAL HISTORY**

### A.    **State Trial Court**

In the May term of 2006, the Lucas County, Ohio Grand Jury indicted Petitioner for one count of aggravated murder in violation of ORC §2903.01(A) and (F).  ECF Dkt. #14-1.  On October 16, 2006, the State of Ohio filed a notice of intent to use evidence of other acts and admissions from a prior assault/domestic violence investigation on May 23, 2006 pursuant to Rule 12(D)(1) of the Ohio Rules of Criminal Procedure.  ECF Dkt. #14-2; see also ECF Dkt. #14-4.  On October 31, 2006, Petitioner, through counsel, filed a motion to suppress any oral statements that he made which were illegally obtained.  ECF Dkt .#14-3.  On November 2, 2006, Petitioner filed a motion for the State to give notice and for the court to exclude any evidence relating to other crimes, wrongs or acts for which Petitioner was not indicted.  ECF Dkt. #14-4.  The State filed a response.  ECF Dkt. #14-5.  The State filed a supplement to its response and Petitioner thereafter filed a supplement to his motion to suppress.  ECF Dkt. #15-1 and ECF Dkt. #15-2.  The trial court held a hearing on the motion to suppress and granted in part and denied in part the motion.  ECF Dkt. #15-3.

On March 6, 2007, Petitioner, through counsel, filed a motion in limine to exclude the State from admitting any evidence relating to other crimes, wrongs or acts for which Petitioner was not indicted in this case.  ECF Dkt. #15-4.  Petitioner, through counsel, also filed a motion in limine to exclude testimony regarding a purported rape or assault with an object, a motion in limine to prohibit the display of tangible things during trial, a motion in limine to exclude photographs of the decedent, and a motion in limine to exclude testimony regarding Battered Woman Syndrome ("BWS").  ECF Dkt. #15-5; ECF Dkt. #16-1; ECF Dkt. #16-2; ECF Dkt. #16-3.

The trial court held a hearing on the motions and on May 2, 2007, denied the motions.  ECF Dkt. #16-4.

On May 4, 2007, the jury found Petitioner guilty of aggravated murder as charged in the indictment.  ECF Dkt. #16-5.  On May 24, 2007, the trial court sentenced Petitioner to a mandatory term of life imprisonment with parole eligibility after 30 years.  ECF Dkt. #17-1.

**B.**     **Direct Appeal**

On June 22, 2007, Petitioner, through new counsel, filed a notice of appeal to the Ohio Court of Appeals for the Sixth District.  ECF Dkt. #17-2.  Petitioner raised the following assignments of error in his appellate brief:

*Assignment of Error no. 1:*

The admission of testimony regarding *Battered Women's Syndrome* violated Mr. Richardson's rights to Due Process and to a Fair Trial as guaranteed by the Constitutions of the United States and the State of Ohio.

*Assignment of Error no. 2:*

The admission of other-acts testimony violated Mr. Richardson's rights to Due Process and to a Fair Trial as guaranteed by the Constitutions of the United States and the State of Ohio.

*Assignment of Error no. 3:*

The conviction for aggravated murder with prior calculation and design was against the manifest weight of the evidence.

*Assignment of Error no. 4*:

The admission of expert testimony regarding blood-spatter evidence violated Mr. Richardson's rights to Due Process and to a Fair Trial as guaranteed by the Constitutions of the United States Constitution and the State of Ohio.

*Assignment of Error no. 5:*

The admission of hearsay testimony of the victim, through the testimony of 2 police officers and Barbra Najmi, violated the Confrontation Clauses of the Constitutions of the United States and the State of Ohio.

*Assignment of Error no. 6*:

Mr. Richardson was deprived of his right to the effective assistance of counsel as guaranteed by the Constitutions of the United States and the State of Ohio.

*Assignment of Error no. 7:*

The cumulative effect of the errors at trial was a violation of the appellant's right to a Fair Trial as guaranteed by the Fifth Amendment to the United States Constitution and by Art. I, §10 of the Ohio Constitution.

-8-

ECF Dkt. #17-3.  On July 15, 2009, the Sixth District Court of Appeals sua sponte found that no final appealable order existed from which an appeal could be taken because the trial court did not specifically state in its entry that Petitioner was found guilty.  ECF Dkt. #18-2.  The appellate court therefore remanded the case to the trial court in order to issue a revised sentencing entry that specifically stated that Petitioner was found guilty.  *Id.*  On July 28, 2009, the trial court issued a nunc pro tunc sentencing entry that complied with the appellate court's order.  ECF Dkt. #18-3.

On February 12, 2010, the Ohio appellate court affirmed Petitioner's conviction and sentence. ECF Dkt. #18-4.

### C.      Supreme Court of Ohio

On March 26, 2010, Petitioner, pro se, filed a notice of appeal to the Supreme Court of Ohio. ECF Dkt. #19-1.   In his memorandum in support of jurisdiction, Petitioner raised the following propositions of law:

1.   The admission of testimony regarding *Battered Women's Syndrome* violated Mr. Richardson's rights to Due Process and to a Fair Trial as guaranteed by the Constitutions of the United States and the State of Ohio.

2.   The admission of other-acts testimony violated Mr. Richardson's rights to Due Process and to a Fair Trial as guaranteed by the Constitutions of the United States and the State of Ohio.

3.   The conviction for aggravated murder with prior calculation and design was against the manifest weight of the evidence.

4.   The admission of expert testimony regarding blood-spatter evidence violated Mr. Richardson's rights to Due Process and to a Fair Trial as guaranteed by the Constitutions of the United States and the State of Ohio.

5.   The admission of hearsay testimony of the victim, through the testimony of 2 police officers and Barbra Najmi, violated the Confrontation Clauses of the Constitutions of the United States and the State of Ohio.

6.   Mr. Richardson was deprived of his right to the effective assistance of counsel as guaranteed by the Constitutions of the United States and the State of Ohio.

ECF Dkt. #19-2. On June 23, 2010, the Supreme Court of Ohio declined jurisdiction to hear the case and dismissed the appeal as not involving any substantial constitutional question.  ECF Dkt. #19-3.

### III.  28 U.S.C. § 2254 PETITION

On June 2, 2011, Petitioner, acting *pro se*, filed the instant petition for a writ of habeas corpus.  ECF Dkt. #1.  Petitioner raises the following grounds for relief:

GROUND ONE:  Admission of BWS testimony violated Defendant's Due Process & Fair Trial rights.

Supporting Facts:  The admission of BWS testimony was the subject of a pre-trial hearing, a motion in limine, and an objection at trial.  The Court must determine whether the lower Court applied the incorrect legal standard or applied the standard erroneously, resulting in a violation of the Defendant's constitutional rights.

GROUND TWO:  Admission of 'other-acts' testimony violated the Defendant's Due Process & Fair Trial rights.

Supporting Facts:  During the trial, the Court admitted testimony related to prior incidents of domestic violecne[sic] between the victim and the Defendant.  The incidents were not so temporally-or circumstantially-related to the underlying charge that admission was warranted.  Just as in the BWS-analysis, the issues under the other-acts analysis are bifurcated-Constitutional concerns and Evidentiary concerns.  Also, because the 'other-'acts' testimony was the subject of pre-trial motions, the admission of such evidence must be subjected to harmless-error analysis. Has the State shown beyond a reasonable doubt that the testimony did not contribute to the verdict?

GROUND THREE:  Conviction for Agg. Murder w/Prior Calculation was against the Manifest Weight of the evidence and was based on insufficient evidence.

Supporting Facts:  The State never yet was required to prove beyond a reasonable doubt, that there was some 'kind o f studied analysis with its object being the means by which to kill.' There was never proven a known motive for such an act as to why or by which means did the Defendant go about conducting the crime for which he now standards convicted of.

GROUND FOUR:  Admission of testimony regarding blood-spatter evidence violated Defendant's Due Process & Fair Trial rights.

Supporting Facts:  This 'error' raises an issue as to the propriety of Detective Smith's testimony regarding the physics behind the origin of blood and his '[sic] expert testimony during trial.  Again, the review sought here is bifurcated into a constitutional dimension and an evidentiary dimension.

GROUND FIVE:  Admission of hearsy[sic] testimony of the victim, through the testimony of 2 police officers and Barbra Najmi, violated the Confrontation Clauses of the U.S. Constitution.

| | |
|---|---|
| Supporting Facts: | The issue within this error is whether the statement of Lori Rivera, about which there was a considerable amount of, were testimonial or non-testimonial.  Was the primary purpose of the police interrogation a tool to enable the police to meet an ongoing ecergency[sic] or to establish the facts of a past crime.  Also, because the testimony was the subject of an objection, the error must be considered under a harmless-error analysis. |
| GROUND SIX: | Defendant was denied the assistance of effective counsel. |
| Supporting Facts: | The failure of the Defendant's counsel to object to the admission of hearsay statements during trial clearly constituted a deficient performance.  Specifically, the failure to object on Confrontational grounds raises the issue of whether that error resulted in prejudice to the Defendant. |
| GROUND SEVEN: | The cumulative effect of the errors at trial was a violation of the Defendant's rights to a Fair Trial. |
| Supporting Facts: | Did the cumulative errors delineated to above and aforementioned, deprive the Defendant of his right to a Fair Trial? |

ECF Dkt. #1.

## IV.    PROCEDURAL BARRIERS TO REVIEW

A petitioner must overcome several procedural barriers before a court will review the merits of a petition for a federal writ of habeas corpus.  As Justice O'Connor noted in *Daniels v. United States*, "Procedural barriers, such as statutes of limitations and rules concerning procedural default and exhaustion of remedies, operate to limit access to review on the merits of a constitutional claim." 532 U.S. 374, 381 (2001); *see also United States v. Olano*, 507 U.S. 725, 731 (1993).  However, the Supreme Court has also held that it would be in the interests of the parties and the courts for the merits of a petition to be addressed forthwith if it is clear that the applicant does not even raise a colorable federal claim. *Granberry v. Greer*, 481 U.S. 129, 135 (1987); *Prather v. Rees*, 822 F.2d 1418, 1421-22 (6th Cir. 1987) (lack of exhaustion was properly excused where petition was plainly meritless, the state had not addressed exhaustion, and disposition of the case would not offend federal-state comity).

### A.    Statute of Limitations

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") statute of limitations period for filing a petition for a writ of federal habeas corpus is one year, and it begins to run on the

date judgement became final.  28 U.S.C. §2244(d)(1).  The AEDPA statute of limitations is not at issue in this case.

### B.    Exhaustion of State Remedies

As a general rule, a state prisoner must exhaust all possible state remedies or have no remaining state remedies before a federal court will review a petition for a writ of habeas corpus. 28 U.S.C. § 2254(b) and (c); *see also Baldwin v. Reese*, 541 U.S. 27, 29 (2004).  The exhaustion requirement is satisfied "once the federal claim has been fairly presented to the state courts." *Franklin v. Rose*, 811 F.2d 322, 325 (6th Cir. 1987).  To exhaust a claim, a petitioner must present it "to the state courts under the same theory in which it is later presented in federal court." *Wong v. Money*, 142 F.3d 313, 322 (6th Cir. 1998); *see also McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000).  General allegations of the denial of rights to a "fair trial" and "due process" do not "fairly present" claims that specific constitutional rights were violated.  *McMeans*, 228 F.3d at 681 citing *Petrucelli v. Coombe*, 735 F.2d 684, 688-89 (2d Cir. 1984).

In order to have fairly presented the substance of each of his federal constitutional claims to the state courts, the petitioner must have given the highest court in the state in which he was convicted a full and fair opportunity to rule on his claims.  *Manning v. Alexander*, 912 F.2d 878, 881 (6th Cir. 1990).  A petitioner fairly presents the substance of his federal constitutional claim to the state courts by: (1) relying upon federal cases that use a constitutional analysis; (2) relying upon state cases using a federal constitutional analysis; (3) phrasing his claim in terms of constitutional law or in terms sufficiently particular to allege the denial of a specific constitutional right; or (4) alleging facts that are obviously within the mainstream of constitutional law.  *Clinkscale v. Carter*, 375 F.3d 430, 437 (6th Cir. 2004), quoting *Newton v. Million*, 349 F.3d 873, 877 (6th Cir. 2003); *see also Levine v. Torvik*, 986 F.2d 1506, 1516 (6th Cir. 1993) cert. denied, 509 U.S. 907 (1993)(quotation omitted).  In *Harris v. Lafler*, the Sixth Circuit laid out the options that a district court may pursue in dealing with a petition that contains unexhausted claims:

> When faced with this predicament in the past, we have vacated the order granting the writ and remanded the case to the district court so that it could do one of four things: (1) dismiss the mixed petition in its entirety, *Rhines*, 544 U.S. at 274, 125 S.Ct. 1528; (2) stay the petition and hold it in abeyance while the petitioner returns to state court to raise his unexhausted claims, *id*. at 275, 125 S.Ct. 1528; (3) permit the petitioner to

dismiss the unexhausted claims and proceed with the exhausted claims, *id.* at 278, 125 S.Ct. 1528; or (4) ignore the exhaustion requirement altogether and deny the petition on the merits if none of the petitioner's claims has any merit, 28 U.S.C. § 2254(b)(2).

553 F.3d 1028, 1031-32  (6th Cir. 2009).  The Supreme Court has held that "the petitioner has the burden . . . of showing that other available remedies have been exhausted or that circumstances of peculiar urgency exist."  *Darr v. Burford*, 339 U.S. 200, 218-19 (1950), *overruled in part on other grounds*, *Fay v. Noia*, 372 U.S. 391 (1963).  A petitioner will not be allowed to present claims never before presented in the state courts unless he can show cause to excuse his failure to present the claims in the state courts and actual prejudice to his defense at trial or on appeal, or that he is actually innocent of the crime for which he was convicted.  *Coleman v. Thompson*, 501 U.S. 722, 748 (1991).

## C.   <u>Procedural Default</u>

The procedural default doctrine serves to bar review of federal claims that a state court has declined to address when a petitioner does not comply with a state procedural requirement. *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977).  In these cases, "the state judgment rests on independent and adequate state procedural grounds."  *Coleman,* 501 U.S. at 730.  For purposes of procedural default, the state ruling with which the federal court is concerned is the "last explained state court judgment." *Munson v. Kapture*, 384 F.3d 310, 314 (6th Cir. 2004) citing *Ylst v.Nunnemaker*, 501 U.S. 797, 805 (1991) (emphasis removed).  When the last explained state court decision rests upon procedural default as an "alternative ground," a federal district court is not required to reach the merits of a habeas petition. *McBee v. Abramajtys*, 929 F.2d 264, 265 (6th Cir. 1991).  In determining whether a state court has addressed the merits of a petitioner's claim, federal courts must rely upon the presumption that there is no independent and adequate state grounds for a state court decision absent a clear statement to the contrary.  *Coleman*, 501 U.S. at 735.

Applying this presumption, the Sixth Circuit Court of Appeals established a four-pronged analysis to determine whether a claim has been procedurally defaulted.  *Maupin v. Smith*, 785 F.2d 135 (6th Cir. 1986).  Under the *Maupin* test, a reviewing court must decide:

(1)    whether the petitioner failed to comply with an applicable state procedural rule;

(2)    whether the state courts actually enforced the state procedural sanction;

-13-

(3)     whether the state procedural bar is an "adequate and independent" state ground on which the state can foreclose federal review; and

(4)     if the above are met, whether the petitioner has demonstrated "cause" and "prejudice."

*Id.* at 138.

Under the first prong of *Maupin*, there must be a firmly established state procedural rule applicable to the petitioner's claim and the petitioner must not have complied with the rule. *Ford v. Georgia*, 498 U.S. 411, 423-24 (1991)(state procedural bar that is not "firmly established and regularly followed" cannot serve  to bar federal judicial review); *Franklin v. Anderson*, 434 F.3d 412, 418 (6th Cir. 2006).  The question of whether a state procedural rule was "firmly established and regularly followed" is determined as of the time at which it was to be applied. *Richey v. Mitchell*, 395 F.3d 660, 680 (6th Cir. 2005).

Under the second prong, the last state court to which the petitioner sought review must have invoked the procedural rule as a basis for its decision to reject review of the prisoner's federal claims. *Coleman v. Thompson*, 501 U.S. 722, 729-30 (1991) (appeal dismissed for lack of jurisdiction); *Richey*, 395 F.3d at 678 ("a lapsed claim survives if the state court overlooked the default and decided the claim anyway"); *Baze v. Parker*, 371 F.3d 310, 320 (6th Cir. 2004) (if a state court does not expressly rely on a procedural deficiency, then a federal court may conduct habeas review); *Gall v. Parker*, 231 F.3d 265, 310 (6th Cir. 2000)(even if issue is not raised below, where state supreme court clearly addresses the claim, no procedural bar arises); *Boyle v. Million*, 201 F.3d 711, 716-17 (6th Cir. 2000)(where a state appellate court characterizes its earlier decision as substantive, the earlier decision did not rely on a procedural bar; therefore, the cause and prejudice test does not apply).

Under the third prong, a state judgment invoking the procedural bar must rest on a state law ground that is both independent of the merits of the federal claim and is an adequate basis for the state court's decision.  *Munson v. Kapture*, 384 F.3d 310, 313-14 (6th Cir. 2004).

Under the fourth prong, a claim that is procedurally defaulted in state court will not be reviewable in federal habeas corpus unless the petitioner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or that failure to consider the claim

-14-

will result in a fundamental miscarriage of justice.  *Coleman*, 501 U.S. at 751.  "Cause" is a legitimate excuse for the default, and "prejudice" is actual harm resulting from the alleged constitutional violation.  *Magby v. Wawrzaszek*, 741 F.2d 240, 244 (9th Cir. 1984), *cert. denied*, 490 U.S. 1068 (1985).  If a petitioner fails to show cause for his procedural default, the reviewing court need not address the issue of prejudice.  *Smith v. Murray*, 477 U.S. 527 (1986).

Simply stated, a federal court may review federal claims:

> that were evaluated on the merits by a state court. Claims that were not so evaluated, either because they were never presented to the state courts (i.e., exhausted) or because they were not properly presented to the state courts (i.e., were procedurally defaulted), are generally not cognizable on federal habeas review.

*Bonnell v. Mitchel,* 301 F.Supp.2d 698, 722 (N.D. Ohio 2004).  The above standards apply to the Court's review of Petitioner's claims.

## V.  STANDARD OF REVIEW

The AEDPA governs this Court's review of the instant case because Petitioner filed his petition for the writ of habeas corpus pursuant to 28 U.S.C. § 2254 well after the act's effective date of April 26, 1996.  *Harpster v. Ohio*, 128 F.3d 322, 326 (6th Cir. 1997), *cert. denied*, 522 U.S. 1112 (1998).  Under Section 2254, a state prisoner is entitled to relief if he is held in custody in violation of the United States Constitution or laws or treaties of the United States.  28 U.S.C. § 2254(d).

The AEDPA sets forth the standard of review for the merits of a petition for a writ of habeas corpus.  The AEDPA provides:

> (d)  An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1)  resulted in a decision that was *contrary to*, or involved an *unreasonable application of*, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (emphasis added).  In *Williams v. Taylor*, the Supreme Court clarified the language of 28 U.S.C. § 2254(d) and stated:

-15-

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

529 U.S. 362, 412-13 (2000). Further, the Supreme Court declared that "a federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Id.* Elaborating on the term "objectively unreasonable," the Court stated that "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.*; *see also Bailey v. Mitchell,* 271 F.3d 652, 655-56 (6th Cir. 2001).

The Sixth Circuit Court of Appeals offers the following guidelines for applying the AEDPA limitations:

A.  Decisions of lower federal courts may not be considered.

B.  Only the holdings of the Supreme Court, rather than its dicta, may be considered.

C.  The state court decision may be overturned only if:

   1.  It '[applies] a rule that contradicts the governing law set forth in [Supreme Court of the United States] cases,' [the Supreme Court precedent must exist at the time of petitioner's direct appeal] or;

   2.  the state-court decision 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [Supreme Court] precedent;' or

   3.  'the state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case;' or

   4.  the state court 'either unreasonably extends a legal principle from [a Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply.'

D.  Throughout this analysis the federal court may not merely apply its own views of what the law should be. Rather, to be overturned, a state court's application of Supreme Court of the United States precedent

-16-

must also be objectively unreasonable.  That is to say, that 'a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.'  'An unreasonable application of federal law is different from an incorrect or erroneous application of federal law.'

E.   Findings of fact of the state courts are presumed to be correct. 'The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.'

*Bailey v. Mitchell,* 271 F.3d 652, 655-56 (6th Cir. 2001) (internal citations omitted).

Finally, a reviewing federal court is bound by the presumption of correctness, under which the federal court is obligated to "accept a state court's interpretation of the state's statutes and rules of practice." *Hutchinson v. Marshall*, 744 F.2d 44, 46 (6th Cir. 1984), *cert. denied*, 469 U.S. 1221 (1985); *see also Duffel v. Duttion*, 785 F.2d 131, 133 (6th Cir. 1986).  The presumption of correctness is set forth in 28 U.S.C. § 2254(e), which provides:

(e)(1)In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.

28 U.S.C. § 2254(e).  The presumption of correctness applies to basic primary facts, and not to mixed questions of law and fact.  *Levine v. Torvik*, 986 F.2d 1506, 1514 (6th Cir. 1993), *cert. denied,* 509 U.S. 907 (1993).  The presumption also applies to "implicit findings of fact, logically deduced because of the trial court's ability to adjudge the witnesses' demeanor and credibility." *McQueen v. Scroggy*, 99 F.3d 1302, 1310 (6th Cir. 1996), *cert. denied*, 520 U.S. 1257 (1997).  Furthermore, a reviewing federal court is not free to ignore the pronouncement of a state appellate court on matters of law.  *See Central States, Southeast & Southwest Areas Pension Fund v. Howell*, 227 F.3d 672, 676, n.4 (6th Cir. 2000).  Petitioner has the burden of rebutting the presumption of correctness by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).

The United States Supreme Court recently observed:

Section 2254(d) reflects the view that habeas corpus is a "guard against extreme malfunctions in the state criminal justice systems," not a substitute for ordinary error correction through appeal.  *Jackson v. Virginia*, 443 U.S. 307, 332, n. 5, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (Stevens, J., concurring in judgment).  As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in

-17-

justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

*Harrington v. Richter,* __ U.S. __, 131 S.Ct. 770, 786-787 (2011).

## VI.  ANALYSIS

### A.  PROCEDURAL DEAFAULT

#### 1.  Ground for Relief Number 3–Insufficiency of the Evidence

Respondent contends that Petitioner is procedurally barred from raising the issue of the insufficiency of the evidence to support his convictions as he asserts in Ground for Relief Number Three before this Court.  ECF Dkt. #13 at 68-71.

A petitioner commits a procedural default "by failing to raise a claim in state court, and pursue that claim through the state's ordinary appellate review procedures." *Carter v. Mitchell*, No. 06-4238, - - -F.3d- - -, 2012 WL 3854787 (6th Cir. Sept. 6, 2012 ), quoting *Williams v. Anderson*, 460 F.3d 789, 806 (6th Cir.2006) (quoting *O'Sullivan v. Boerckel*, 526 U.S. 838, 848, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999)) (internal quotation marks omitted).  In order to avoid a procedural default of a ground for relief, a federal habeas petitioner "must have exhausted his or her remedies in state court." *Carter*,  2012 WL 3854787, at *6, citing *O'Sullivan,* 526 U.S. at 842, 119 S.Ct. 1728 and 28 U.S.C. § 2254(b)(1)(A). A federal claim is considered exhausted once it has been "fairly presented" at the first possible opportunity within "one complete round of the State's established appellate review process." *Carter*, 2012 WL 3854787, at *6, quoting *Williams v. Bagley*, 380 F.3d 932, 967 (6th Cir.2004); *Clinkscale v. Carter*, 375 F.3d 430, 437 (6th Cir.2004).  An unexhausted claim is procedurally defaulted if the petitioner fails to exhaust state court remedies and state law no longer allows the petitioner to raise the claim. *Carter*, 2012 WL 3854787, at *6, citing *Williams*, 380 F.3d at 967.

In addition, when "a petitioner has failed to fairly present federal claims to the state courts, and a state procedural rule now prohibits the state court from considering them, the claims are considered procedurally defaulted." *Pudelski v. Wilson*, 576 F.3d 595, 605 (6th Cir.2009).  Likewise, the failure to present an issue to the state supreme court on discretionary review constitutes procedural default. *O'Sullivan*, 526 U.S. at 848, 119 S.Ct. 1728, 144 L.Ed.2d 1.

Here, Petitioner failed to raise his claim of insufficiency of the evidence to the Ohio appellate court and to the Supreme Court of Ohio.  ECF Dkt. #17-3; ECF Dkt. #19-2.  Accordingly, he did not give the state courts an opportunity to address his claim.  Moreover, Petitioner offers no explanation for his failure to raise this issue and merely requests that the "excuse this error and not penalize the petitioner" for his failure to raise the issue.  ECF Dkt. #25 at 458.  Consequently, the undersigned recommends that the Court find that the part of Petitioner's Ground for Relief Number Three asserting the insufficiency of the evidence is procedurally defaulted.

The Court can still consider Petitioner's constitutional arguments if the Court determines that it is "an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent..."  *Murray v. Carrier*, 477 U.S. 478, 485, 106 S.Ct. 2639, 91 L.Ed. 2d 397 (1986).  The Sixth Circuit Court of Appeals explained that the "actual innocence" exception, or the "fundamental miscarriage of justice" gateway, is open to a petitioner who submits new evidence showing that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Williams v. Bagley*, 380 F.3d 932, 973 (6th Cir. 2004), quoting *Schlup v. Delo*, 513 U.S. 298, 327, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995)(quoting *Murray*, 477 U.S. at 496. The Sixth Circuit held that "[t]o establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence." *Id.* Here, Petitioner has produced no new evidence to carry this burden.  Additionally, Petitioner's claims of actual innocence should fail as they are perfunctory.  ECF Dkt. #25 at 462.

## B.  NONCOGNIZABILITY

### 1.  Ground for Relief Number 3–Manifest Weight of the Evidence and Ground for Relief Number 7–Cumulative Error

Respondent also asserts that the manifest weight of the evidence claim that Petitioner presents in Ground for Relief Number Three and the cumulative error claim he presented in Ground for Relief Number Seven are not properly before this Court and/or are not cognizable claims in federal habeas corpus review.  ECF Dkt. #13 at 71-73.

The undersigned recommends that the Court find that Petitioner's manifest weight of the evidence claim presented in Ground for Relief Number Three is not cognizable in this Court.  A claim

-19-

that a conviction is against the manifest weight of the evidence is not cognizable in federal habeas corpus review. *Young v. Kemp*, 760 F.2d 1097, 1105 (11th Cir.1985); *Walker v. Timmerman-Cooper*, No. 1:05CV103, 2006 WL 3242101 (S.D. Ohio Oct. 5, 2006).  Manifest weight claims are derived from purely state law whereby the state appellate court sits as a "thirteenth juror and disagrees with fact finder's resolution of conflicting testimony" and finds that the "jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Tibbs v. Florida*, 457 U.S. 31, 41-47 (1982); *State v. Thompkins*, 78 Ohio St.3d 380, 389, 678 N.E.2d 541, 546-548 (1997)(superseded by state constitutional amendment on other grounds, *State v. Smith*, 80 Ohio St.3d 89, 684 N.E.2d 668 (1997), cert. denied 523 U.S. 1125 (1998)), quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1983).  Accordingly, the manifest weight of the evidence claim in Ground for Relief Numbers 3 lacks cognizability and should be dismissed.

In his seventh ground for relief, Petitioner asserts that the cumulative effect of the errors at his trial violated his constitutional rights to a fair trial.  ECF Dkt. 31 at 12.  The undersigned recommends that the Court find that Petitioner's Ground for Relief Number Seven is not cognizable before this Court.  In *Moore v. Parker*, the Sixth Circuit Cout of Appeals faced the same assertion by a federal habeas corpus petitioner and found that "post-AEDPA, not even constitutional errors that would not individually support habeas relief can be cumulated to support habeas relief."  425 F.3d 250, 256 (6th Cir. 2005), citing *Scott v. Elo*, 302 F.3d 598, 607(6th Cir. 2002) and *Lorraine v. Coyle*, 291 F.3d 416, 447 (6th Cir. 2002).  In *Lorraine v. Coyle*, 291 F.3d at 447, the Sixth Circuit noted that "the Supreme Court has not held that distinct constitutional claims can be cumulated to grant habeas relief."  Petitioner cites this Court to no United States Supreme Court holding that supports a cumulative error claim or that requires the review of such a claim.  ECF Dkt. #25.  Accordingly, the Court should find that Ground for Relief Number Seven is not cognizable before this Court.

### C.  **MERITS**

Respondent conducts a merits analysis of Petitioner's Grounds for Relief Numbers One, Two, Four, and Five and argues that all of these assertions regarding the alleged wrongful admission of evidence lack merit upon federal habeas review.  ECF Dkt. #13 at 73-91.  The undersigned agrees and recommends that the Court find that the state appellate court's decision denying Grounds Two,

Four and Five was not contrary to or an unreasonable application of United States Supreme Court precedent and Petitioner's Ground for Relief Number One is not well-taken because the admission of the BWS testimony did not have a "substantial and injurious" effect on the jury's verdict. *Brecht v. Abrahamson*, 507 U.S. 619, 623, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993), quoting *Kotteakos v. United States*, 328 U.S. 750, 776, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946).

In Grounds for Relief Numbers One, Two and Four, Petitioner asserts that the trial court's rulings admitting evidence at trial violated his federal constitutional rights to due process and a fair trial. ECF Dkt. #1 at 5, 7, 10-11. As to the claims in Grounds Two and Four, the Ohio appellate court found that the trial court did not abuse its discretion in admitting other acts evidence and the testimony of Detective Smith as to blood-spatter evidence. ECF Dkt. #18-4 at 409-416. As to Ground for Relief Number One, the Ohio appellate court found that while the admission of BWS testimony was erroneous, the error was harmless beyond a reasonable doubt because the state's case against Petitioner was "so strong." *Id.* at 418-419.

The undersigned notes that federal habeas corpus is available only to correct federal constitutional violations. 28 U.S.C. § 2254(a); *Wilson v. Corcoran*, 562 U.S. ___, 131 S.Ct. 13, 178 L.Ed.2d 276 (2010); *Lewis v. Jeffers*, 497 U.S. 764, 780, 110 S.Ct. 3092, 111 L.Ed.2d 606 (1990); *Smith v. Phillips*, 455 U.S. 209, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982), *Barclay v. Florida*, 463 U.S. 939, 103 S.Ct. 3418, 77 L.Ed.2d 1134 (1983). "[I]t is not the province of a federal habeas court to reexamine state court determinations on state law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 67–68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991). Thus, federal habeas review of state law evidentiary rulings is "extremely limited." *Jordan v. Hurley*, 397 F.3d 360, 362 (6th Cir. 2005).

Evidentiary questions generally do not rise to the constitutional level unless the error was so prejudicial as to deprive a defendant of a fair trial. *Cooper v. Sowders*, 837 F.2d 284, 286 (6th Cir.1988); *Walker v. Engle*, 703 F.2d 959, 962 (6th Cir.1983); *Bell v. Arn*, 536 F.2d 123 (6th Cir. 1976); *Burks v. Egeler*, 512 F.2d 221, 223 (6th Cir.1975). Where an evidentiary error is so egregious that it results in a denial of fundamental fairness, it may violate due process and thus warrant habeas

-21-

relief. *Bey v. Bagley*, 500 F.3d 514, 519–20 (6th Cir.2007); *Bugh v. Mitchell*, 329 F.3d 496 (6th Cir.2003), citing *Coleman v. Mitchell*, 244 F.3d 533, 542 (6th Cir.2000). "Generally, state-court evidentiary rulings cannot rise to the level of due process violations unless they 'offend[ ] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.'" *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir.2000) (quoting *Montana v. Egelhoff*, 518 U.S. 37, 43, 116 S.Ct. 2013, 135 L.Ed.2d 361 (1996)).  In order to determine whether the admission or exclusion of evidence denied fundamental due process rights, a court should consider the extent to which the evidence is "critical" to the case, whether it "tend[s] to exculpate" the accused, and whether the evidence bears "persuasive assurances of trustworthiness." *Turpin v. Kassulke*, 26 F.3d 1392, 1396 (6th Cir.1994), quoting *Chambers v. Mississippi*, 410 U.S. 284, 297-302, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973).

## 1.      GROUND FOR RELIEF NUMBER 1

In Ground for Relief Number One, Petitioner asserts that the trial court's admission of testimony relating to BWS violated his federal constitutional rights to due process and a fair trial. ECF Dkt. #1 at 5-8, 10.  Before trial, Petitioner, through counsel, filed a motion in limine to exclude testimony regarding BWS, including testimony from Dr. Hinojosa, on the subject. ECF Dkt. #16-3 at 160.  Petitioner argued that Dr. Hinojosa never spoke, saw or diagnosed the victim, Ms. Rivera, in this case and therefore should be barred from testifying about BWS in this case. *Id.* at 161. Petitioner also asserted that the BWS testimony allowed in his case did not meet any of the criteria for which it was allowed to be presented, and that even if Dr. Hinojosa would testify as to the general characteristics of the victim suffering from BWS, this would be severely prejudicial. *Id.* at 161-162.

The trial court denied Petitioner's motion in limine and allowed Dr. Hinojosa to testify as to BWS at trial. ECF Dkt. #16-4.  Petitioner raised this issue on appeal to the Sixth District Court of Appeals and that court held the following:

> In his first assignment of error, appellant asserts that his constitutional rights to due process and a fair trial were violated by the introduction of testimony regarding Battered Women's Syndrome ("BWS").  In support, appellant argues that, pursuant to R.C. 2901.06, testimony concerning BWS is admissible in Ohio only if: (1) the accused enters a plea of not guilty; (2) the accused claims self-defense; or (3) to explain the actions of a witness in cases where the witness's credibility has been challenged. In addition, appellant argues that the testimony concerning BWS violated

Evid. R. 401, 402 and 403, because it is not relevant in this case and was highly prejudicial to the defense; and an insufficient foundation was laid for the introduction of BWS testimony, in violation of Evid. R. 104)(B).

The state responds by arguing that the use of BWS testimony in this case meets the criteria set forth by this court in *State v. Caudill*, 6th Dist. No. WD-07-009, 2007-Ohio-1557.  We disagree with the state's position, for the following reasons.

In *Caudill, supra*, we stated that, under the proper circumstances, expert testimony regarding BWS is admissible at trial by the prosecution "'to help a jury understand a victim's reaction to abuse in relation to her credibility.'"  *Caudill,* supra, at ¶ 39, quoting *State v. Haines*, 112 Ohio St.3d 393, 2006-Ohio-6711, at ¶ 29 and 35, citing *State v. Koss* (1990), 49 Ohio St.3d 213, 218.  Nevertheless, even though expert testimony concerning BWS technically meets the requirements of Evid. R. 702, it cannot be admitted unless it conforms to the other requirements of the Ohio Rules of Evidence.  Id.

In *State v. Koss,* supra, the Ohio Supreme Court held that BWS evidence may be used by a defendant to establish self-defense.  Id., at 218.  See, also, R.C. 2901.06(B) and 2945.392.  In *State v. Haines*, supra, the Ohio Supreme Court extended the application of *Koss*, by holding that BWS testimony is relevant pursuant to Evid. R. 401 if it is used to explain a complainant's inconsistent actions relating to credibility, such as endurance of prolonged abuse "'accompanied by attempts at hiding or minimizing the abuse, delays in reporting the abuse, or recanting allegations of abuse * * * .'"  Id., at ¶ 44, quoting *People v. Christel* (1995), 449 Mich. 578, 580.  In such cases, the party that introduces BWS evidence has the burden to show that the witness's behavior is consistent with that of a BWS victim, and that the witness "'has behaved in such a manner that the jury would be aided by expert testimony which provides a possible explanation for the behavior.'"  Id. at ¶ 47, quoting *State v. Stringer* (1995), 271 Mont. 367, 378.

In this case, Rivera is a *deceased* victim.  She is not the defendant in this case.  Neither is she a "complainant," or a "witness" who testified against appellant at trial.  As set forth in our determination of appellant's second and fifth assignments of error, the only statements made by Rivera that were admitted at trial were non-testimonial statements which were made under inherently trustworthy circumstances that qualify them as exceptions to the hearsay rule.  Any attempt to explain or interpret Rivera's behavior during her relationship with appellant through the introduction of BWS testimony is therefore irrelevant to the issue of who was responsible for her death.

This court has carefully considered the trial court's record and, upon consideration, we conclude that the BWS testimony offered in this case does not meet the test of relevancy pursuant to Evid. R. 401, and the trial court erred by admitting such testimony.  Nevertheless, the trial court's finding does not mandate an automatic reversal, since such an error can be rendered harmless "if we determine that it was harmless beyond a reasonable doubt."  *State v. Conway*, 108 Ohio St. 3d 214, 2006-Ohio-791, ¶ 78, citing *Chapman v. California* (1967), 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705.  In determining whether an error is harmless beyond a reasonable doubt, we must determine "whether there is a reasonable probability that the evidence complained of might have contributed to the conviction."  Id., citing *Chapman v. California*, supra, at 23; *State v. Madrigal* (2000), 87 Ohio St. 378, 388.

The record shows the following:

-23-

Rivera was beaten to death in a park, across the street from an apartment she shared with appellant. Appellant was found sitting on the steps of the apartment building, shortly after the beating took place. He had blood on his face, which later was found to contain the victim's DNA. He was in possession of the victim's key fob, which he used to open the apartment so police could conduct a search. Surveillance tapes showed appellant with the victim shortly before she was murdered, wearing white clothing; however, when police found appellant, he was wearing dark clothing. Appellant's white clothing was never found. Those same tapes show appellant, wearing dark clothing, leaving the apartment building with a trash bag, just before Rivera was found, beaten, in the park. As set forth above, admissible evidence was presented to show that appellant's relationship with the victim had been violent on several previous occasions.

On consideration of the foregoing, we find that the state's case against appellant was so strong that it rendered the trial court's error in admitting Hinojosa's testimony regarding BWS harmless beyond a reasonable doubt. Accordingly, appellant's first assignment of error is not well-taken.

ECF Dkt. #18-4 at 416-419. Thus, while finding that the trial court did err in admitting the BWS testimony, the appellate court found that this error was harmless because other ample evidence existed in order to establish Petitioner's guilt. *Id*.

The undersigned notes that the Ohio appellate court relied upon *Chapman* in finding that the erroneous admission of the BWS testimony was "harmless beyond a reasonable doubt." ECF Dkt. #18-4 at 418. In *Chapman*, the United States Supreme Court "held that a federal constitutional error can be considered harmless only if a court is 'able to declare a belief that it was harmless beyond a reasonable doubt.'" *Fry v. Pliler*, 551 U.S. 112, 116, 127 S.Ct. 2321, 168 L.Ed.2d 16 (2007), quoting *Chapman*, 386 U.S. at 24. In *Brecht v. Abrahamson*, the Supreme Court rejected application of the *Chapman* standard to the collateral review of federal habeas corpus claims, holding that an error upon collateral review is harmless "'unless it had substantial and injurious effect or influence in determining the jury's verdict.'" *Fry*, 551 U.S. at 116, quoting *Brecht*, 507 U.S. at 631, quoting *Kotteakos*, 328 U.S. at 776. Accordingly, a federal court reviewing habeas proceedings under § 2254 "must assess the prejudicial impact of constitutional error in a state-court criminal trial under the 'substantial and injurious effect' standard set forth in *Brecht, supra,* whether or not the state appellate court recognized the error and reviewed it for harmlessness under the 'harmless beyond a reasonable doubt' standard set forth in *Chapman*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705." *Fry*, 551 U.S. at 121-122. In determining whether an error is harmless under *Brecht*, the Court considers whether

the improperly admitted evidence "had substantial and injurious effect or influence in determining the jury's verdict" in light of the record as a whole. *Brecht*, 507 U.S. at 638.

Applying the proper harmless error standard to the instant case, the Court should find that the trial court's admission of the BWS testimony constituted harmless error in light of the overall evidence presented at trial. As set forth in the Ohio appellate court's opinion quoted above, ample evidence existed to find Petitioner guilty without any testimony concerning BWS. Thus, the undersigned recommends that the Court find that the BWS testimony did not have a "substantial and injurious effect" on the jury's verdict such that a due process violation had occurred.

### 2. GROUND FOR RELIEF NUMBER 2

In Ground for Relief Number Two, Petitioner asserts that the trial court's admission of other acts testimony violated his due process and fair trial rights. ECF Dkt. #1 at 7-8. Petitioner, through counsel, had filed a motion in limine requesting that the trial court exclude relating to other acts, wrongs or uncharged misconduct of Petitioner. ECF Dkt. #15-4. The trial court denied the motion in limine. ECF Dkt. #15-4. The Ohio appellate court addressed this claim on appeal and found the following:

> In his second assignment of error, appellant asserts that his constitutional rights to due process and a fair trial were compromised by the admission of other-acts evidence. Specifically, appellant argues that the trial court erred by denying his motion in limine and allowing the prosecution to present the testimony of Najmi, Detective Poole and Sergeant Giesige as to events that transpired between appellant and Rivera on April 27 and May 23, 2006, because those events were not circumstantially or temporally related to Rivera's murder.
>
> As set forth above, the trial court's decision to admit or exclude evidence will not be overturned on appeal absent a finding of abuse of discretion. *State v. Bruce,* 8th Dist. No. 92016, 2009 Ohio 6214, P 54. Similarly, the trial court's denial of a motion in limine is within the sound discretion of the trial court. *Thakur v. Health Care and Retirement Corp. of Am.,* 6th Dist. No. L-08-1377, 2009 Ohio 2765, P 16. An abuse of discretion connotes more than a mere error of law or judgment, instead requiring a finding that the trial court's decision was unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 219, 5 Ohio B. 481, 450 N.E.2d 1140.
>
> Despite the trial court's considerable discretion in such cases, "evidence of a criminal defendant's prior criminal acts is generally inadmissible." *Id.*; *State v. Bruce, supra.* Exceptions to this exclusion are set forth in Evid.R. 404(B), which states that: "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

-25-

The Ohio Supreme Court has held that, in order for the exception set forth in Evid.R. 404(B) to apply, there must be "substantial proof that the alleged other acts were committed by the defendant." *State v. Lowe* (1994), 69 Ohio St.3d 527, 530, 1994 Ohio 345, 634 N.E.2d 616. *(Other citations omitted.)* Evidence of other acts may be used "'to establish the identity of a perpetrator by showing that he has committed similar crimes and that a distinct, identifiable scheme, plan, or system was used in the commission of the charged offense.'" *Id.,* at 531, quoting *State v. Smith* (1990), 49 Ohio St.3d 137, 141, 551 N.E.2d 190. In *Lowe*, the Ohio Supreme Court set out the distinction between the impermissible use of such evidence to show that a defendant is the *type* of individual who would commit the charged offense, as opposed to the proper use of such evidence to show that he or she *is the actual individual* who committed the offense. *Lowe, supra, at 530.* Accordingly, other-acts evidence may be used to establish a "behavioral fingerprint" which "can be used to identify the defendant as the perpetrator * * * through the characteristics of acts rather than through a person's character." *Id. at 531.*

In addition, Ohio courts have held that the other acts must be temporally and circumstantially related to the operative facts of the charged offense. *State v. Hawn (2000),* 138 Ohio App.3d 449, 461, 741 N.E.2d 594; *State v. Burson* (1974), 38 Ohio St.2d 157, 311 N.E.2d 526; *State v. Curry* (1975), 43 Ohio St.2d 66, 330 N.E.2d 720; *State v. Smith, supra.* In *Hawn,* the defendant's girlfriend, Sue Jack, died of a gunshot wound. Hawn was convicted of the murder by a jury. On appeal, the Second District Court of Appeals found that the identity of Jack's killer was not at issue, since Hawn claimed that Jack committed suicide. The appellate court also found that prior incidents of domestic violence between Hawn and Jack, including "hair-pulling and black-eye incident[s]," were "factually and chronologically separate from the operative facts the crime [was] alleged to have involved" and were therefore inadmissible for the purpose of showing that Hawn was Jack's killer. *Hawn, supra, at 463.* The appellate court further stated that, "even if the *identity* of the perpetrator of the crime alleged had been in issue, the other acts which this [three month-old] evidence involves was inadmissible to prove it." Id. 1

1 The appellate court also noted that motive, intent, and absence of mistake or accident as possible justifications for admitting the other-acts evidence were not in issue during Hawn's trial. Id.

Unlike the scenario in *Hawn,* the identity of Rivera's killer is directly at issue in this case. 2 Accordingly, in an attempt to identify appellant as Rivera's killer, and also to show plan, prior calculation and design, the prosecution introduced other-acts evidence, which included: (1) Poole's testimony that he saw a beaten and bleeding Rivera on April 27, 2006, and that Rivera identified appellant as the person who beat her; (2) Najmi's testimony that she saw "stomp marks" on Rivera's face on April 27, 2006, and that Rivera was living with appellant at the time; (3) Giesige's testimony regarding that she overheard appellant threaten to "bash in" Rivera's skull on May 23, 2006, and that Rivera said appellant would have killed her if police had not arrived in time to stop him; (4) Barker's testimony concerning Rivera's physical condition when she first rented the apartment in Executive Towers; and (5) Clark's and Losey's testimony that, on August 17, 2006, they overheard appellant threaten to kill Rivera while they were talking to Rivera on the telephone.

2 The fact that Rivera was murdered was not disputed at trial. Appellant not only denied killing Rivera, he raised the issue at trial of whether her killer was a former boyfriend named Jose. Ohio courts have held that any claim by the accused that "amounts to 'someone else did it, not me' raises the issue of identity." *State v. Griffin* (2001), 142 Ohio App.3d 65, 74, 753 N.E.2d 967.

On consideration of the foregoing, we find that the other-acts evidence offered by the prosecution was sufficiently related in time and circumstance as to be used to identify appellant as the individual who beat Rivera to death in Toledo Spain Park on August 17, 2006. Accordingly, the trial court did not abuse its discretion by allowing such evidence to be used at trial, and appellant's second assignment of error is not well-taken.

ECF Dkt. #18-4 at 409-413.

Petitioner asserts that the trial court violated the Ohio Rules of Evidence and his federal constitutional rights to due process and a fair trial. As to violations of the Ohio Rules of Evidence, as indicated above, a federal court may not issue a writ of habeas corpus "on the basis of a perceived error of state law." *Pulley v. Harris*, 465 U.S. 37, 41, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984); *Smith v. Sowders*, 848 F.2d 735, 738 (6th Cir.1988). A federal court may review a state prisoner's habeas petition only on the grounds that the challenged confinement is in violation of the Constitution, laws or treaties of the United States. 28 U.S.C. § 2254(a). "'[E]rrors in application of state law, especially with regard to the admissibility of evidence, are usually not cognizable in federal habeas corpus.'" *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir.2003) (quoting *Walker v. Engle*, 703 F.2d 959, 962 (6th Cir.1983) (other citations omitted)). A federal habeas court "must defer to a state court's interpretation of its own rules of evidence and procedure when assessing a habeas petition." *Miskel v. Karnes*, 397 F.3d 446, 453 (6th Cir.2005) (internal quotation omitted).

The Sixth Circuit Court of Appeals has found that no clearly established United States Supreme Court precedent exists holding that the admission of prior bad acts evidence violates the Due Process Clause. *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir.2003); *Paige v. Bradshaw*, No. 1:05CV2618, 2007 WL 4323785, at *12 (N.D.Ohio Apr. 4, 2007), unpublished. In *Bugh*, the petitioner sought federal habeas relief, claiming that he was denied his constitutional right to due process because the state court admitted evidence concerning similar, uncharged acts of child molestation. Citing *Estelle v. McGuire*, 502 U.S. 62, 75 n. 5, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991), the *Bugh* Court held that there is no clearly established Supreme Court precedent holding that a state violates due process by permitting propensity evidence in the form of other bad acts evidence. *Bugh*, 329 F.3d at 512. In *Estelle*, the United States Supreme Court expressly declined to rule on the issue of "whether a state law would violate the Due Process Clause if it permitted the use of 'prior crimes'

evidence to show propensity to commit a charged crime." 502 U.S. at 75 n. 5. The *Bugh* Court explained that the Supreme Court's declination left the issue open and thus federal habeas courts cannot find that state court rulings allowing propensity use of other acts evidence are contrary to, or involve an objectively unreasonable application of, clearly established federal law. *Bugh*, 329 F.3d at 512; *see also Paige,* 2007 WL 4323785, at *12.

Thus, even if the trial court improperly admitted the prior bad acts evidence in the instant case, no "clearly established" due process right regarding the use of this evidence was violated because neither the Supreme Court nor the Sixth Circuit has made a ruling contrary to *Bugh*. *See* ECF Dkt. #11-3 at 787-789; *Rice v. Moore*, 633 F.Supp.2d 541, 556 (S.D.Ohio 2008) (quoting *Sifuentes v. Prelesnik*, No. l:03cv637, 2006 WL 2347529, at *1 (W.D.Mich.Aug.11, 2006)); *see also Collier v. Lafler*, No. 09-1477, 419 Fed. App'x. 555, 558, 2011 WL 1211465 (6th Cir.2011), unpublished.

Moreover, Petitioner fails to show that any alleged error made by the trial court as to admitting the other acts was so egregious that fundamental fairness or a fundamentally fair trial was denied. A state court's procedure or evidentiary error can warrant federal habeas corpus relief only when it "renders the proceeding so fundamentally unfair as to deprive the petitioner of due process under the Fourteenth Amendment." *McAdoo v. Elo*, 365 F.3d 487, 494 (6th Cir.), *cert. denied*, 543 U.S. 892, 125 S.Ct. 168, 160 L.Ed.2d 156 (2004) (citing *Estelle v. McGuire*, 502 U.S. 62, 69–70, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991)). As outlined by the Ohio appellate court in its decision, more than sufficient evidence existed upon which the jury could have found Petitioner guilty of aggravated murder. ECF Dkt. #18-4 at 418-419. The evidence of any prior bad acts committed by Petitioner was not the critical factor in the case against Petitioner. The victim in this case, Ms. Rivera, was found beaten to death in a park across the street from the apartment where she lived with Petitioner. *Id*. at 418. Petitioner was sitting on the steps of the apartment building shortly after the death and he had blood on his face which contained the victim's DNA. *Id*. He had the victim's key fob and allowed police officers in to conduct a search *Id*. They found a broken telephone lying on the floor inside of the apartment. *Id*. at 393. They also found "red spots" on the bathtub. *Id*. at 394. The apartment surveillance tapes presented at trial showed Petitioner and the victim entering the

apartment building together and leaving and walking across the parking lot together one hour later. *Id.* at 397; ECF Dkt. #26-5 at 1231.  The tapes showed that Petitioner had on light-colored clothing as they left.  ECF Dkt. #18-4 at 397.  Surveillance tapes show that Petitioner returned to the apartment building shortly thereafter for three minutes, and then left again, still wearing light-colored clothing.  *Id.*; ECF Dkt. #26-5 at 1233-1234.  He then returned twenty-seven minutes later, after the murder, and the tapes showed that he then left the building again in a dark-hooded sweatshirt with a plastic bag and returned thereafter and sat on the front steps of the building, still in dark-colored clothing.  *Id.* ECF Dkt. #26-5 at 1235-1238.  Residents of the apartment complex who were in the park near the time of the incident testified that they saw a man wearing light-colored clothing.  ECF Dkt. #18-4 at 392-393.  The white sweatshirt that the surveillance tape showed Petitioner wearing as he walked out of the building with the victim was not found in the apartment.  *Id.* at 399.  The officer who interviewed Petitioner on the night of the murder testified that Petitioner told her that his relationship with the victim was "rocky" and the victim was "abusive" and they had fought on the night of the murder, but they made up and went outside for a walk.  *Id.* at 398.  Petitioner had stated that they then returned home and the victim went out to get a beer, but when she did not return home, Petitioner went to look for her.  *Id.*  Petitioner also told the officer that he had worn the same dark clothes all day.  *Id.* at 399.  Petitioner also indicated that the blood on his face was from the victim slapping him which caused his nose to bleed.  *Id.*

The prosecution's case against Petitioner focused upon the evidence and testimony presented regarding the night of the murder and not the prior bad acts occurring between Petitioner and the victim.  The other acts evidence was not critical because considerable other evidence was offered at trial to establish Petitioner's guilt.  Accordingly, even if the admission of the prior bad acts was erroneous, the undersigned recommends that the Court find that this error was not so egregious that it resulted in an unreliable verdict or otherwise caused the denial of a fundamentally fair trial.

For these reasons, the undersigned recommends that the Court find no merit to Petitioner's second ground for relief.

### 3.    GROUND FOR RELIEF NUMBER 4 - BLOOD SPATTER

The same type of analysis set forth in Ground for Relief Number Two applies to the instant Ground for Relief.  In this Ground for Relief, Petitioner asserts that his federal constitutional rights to due process and a fair trial were violated when the trial court admitted as expert testimony the testimony of a police officer regarding blood-spatter evidence.  ECF Dkt. #1 at 10.

The Ohio appellate court addressed the claim as follows:

> In his fourth assignment of error, appellant asserts that the trial court erred by allowing Smith to testify as an expert in blood-spatter evidence.  In support, appellant argues that his rights to "Due Process and a Fair Trial as guaranteed by the Constitutions of the United States and the State of Ohio" were violated because Smith did not have the requisite experience or training to qualify as an expert witness in blood-spatter evidence pursuant to Evid. R. 702.

> Evid. R. 702 states that a witness may testify as an expert "by reason of his or her 'specialized knowledge, skill, experience, training, or education.'  Neither special education nor certification is necessary to confer expert status upon a witness.  The individual offered as an expert need not have complete knowledge of the field in question, as long as the knowledge he or she possesses will aid the trier of fact in performing its fact-finding function." *State v. Davis*, 116 Ohio St.3d 404, 2008-Ohio-2, ¶ 148, citing *State v. Baston* (1999), 85 Ohio St.3d 418, 423; *State v. Hale*, 119 Ohio St.3d 118, 2008-Ohio-3426, ¶ 54.  As with other evidentiary rulings, the trial court's determination that a witness is qualified as an expert will not be overturned on appeal absent a finding of abuse of discretion.  *Baston*, supra.

> At trial, Detective Smith testified as to his observations at the crime scene, including the location of the attack, the position of clumps of Rivera's blood-soaked hair and a pair of woman's sandals, and the procedure involved in collecting and preserving evidence at the crime scene.  The prosecutor then asked Smith a question concerning his observation of "blood spatter" on appellant's face.  In response, Smith defined "blood spatter" as follows:

> "Blood spatter is it's not just droppings of blood like if you would cut your hand and it rolled down your hand.  Spatter means blood can be sprayed onto something.

> "And there is such thing as low-velocity, medium-velocity and high-velocity blood spatter, and there's basically a common sense difference between what those are.
> * * *
> "The spatter, the difference between that is a large drop of blood or amount of blood, because of it's[sic] weight, because it's large, can travel a longer distance."

> At that point, the defense objected to Smith's testimony on the basis that Smith was not qualified to testify as to the nature of blood spatter evidence.  The prosecution responded by offering the following foundation testimony:

> "Question: Detective Smith, I'm going to step back a second here.  How many – you've been to how many crime – major crime scenes?

"Answer: I would have to say hundreds.

"Question: How many of those crime scenes actually involved blood?

"Answer: I would have to say many. I've never put a number on it, but due to the nature of the business that we're involved in, I get, we respond to a lot of assaults and homicides, and they often involve blood.

"Question: Are you aware of the concept of what blood spatter is?

"Answer: Yes, I am aware of that concept.

"Question: How are you aware of that?
"Answer: Through my experience of going to crime scenes.
"Question: And you often compared blood at crime scenes through your employment to determine what type of spatter it is?

"Answer: Yes. Looking at blood spatter, you can tell a lot.

"Question: Detective Smith, have you done any type of evaluations with blood spatter at other crime scenes?

"Answer: Yes, I have.

"Question: Have you testified to that in other cases?
"Answer: Yes. I've testified about blood I've located at crime scenes."

After the above exchange, Smith testified as to difference[sic] between "blood spatter," which "appears to be a dot or drop of blood," and "contact transfer," which he defined as "swipes, wipes or smears." Smith also testified that the blood on appellant's face on August 18, 2006, appeared to be caused by either medium-velocity or high-velocity impact blood spatter. Smith also testified that appellant had blood underneath his eye, on his cheek and chin and behind his left ear. Later, Smith described the process of collecting DNA evidence from appellant to compare to the blood samples.

On consideration of the foregoing, we find that Smith had sufficient experience and expertise to testify as to the nature of blood spatter evidence and its use in evaluating a crime scene. Accordingly, the trial court did not abuse its discretion by allowing Smith to testify as to those issues at trial, and appellant's fourth assignment of error is not well-taken.

ECF Dkt. #18-4 at 413-416.

"The admission of expert testimony in a state trial presents a question of state law which does not warrant federal habeas relief unless the evidence violates due process or some other federal constitutional right." *Randolph v. Wolfenbarger*, No. 04-CV-73475-DT, 2006 WL 1662885, at *5 (E.D. Mich. June 12, 2006), unpublished, citing *Keller v. Larkins*, 251 F.3d 408, 419 (3rd Cir.2001). In addition, a trial court's determination as to whether an individual is qualified to give expert testimony constitutes only a state law evidentiary issue. *Randolph*, 2006 WL 16628-85, at *5, citing

*United States ex. rel. Ruddock v. Briley*, 216 F.Supp.2d 737, 743 (N.D.Ill.2002); *see also Vaquez-Torrez v. Dorsey*, 66 F.3d 339, 1995 WL 539575, *1 (10th Cir.1995).  Consequently, even if the state trial court incorrectly admitted Detective Smith's blood spatter testimony as expert testimony, this is a state law evidentiary error not cognizable on habeas review.  Thus, Petitioner can overcome the bar on review of this claim only if he shows that Detective Smith's testimony rendered his trial fundamentally unfair.

The undersigned recommends that the Court find that Petitioner has not shown that the admission of Detective Smith's testimony regarding blood spatter rendered his trial fundamentally unfair.  Petitioner complains that Detective Smith failed to reveal that he had any individualized training regarding the origins or physics of blood spatter. ECF Dkt. #25 at 468.  However, even if this resulted in trial court error, Petitioner fails to explain how Detective Smith's testimony prejudiced his case.  Other witnesses at trial testified as to the presence of blood on Petitioner's face, cheek and chin and behind his left ear.  Detective Applin, a detective assigned to the Investigative Services Bureau in the Persons Section of the Toledo Police Department who also aided in a cursory search of the apartment where the victim lived, testified that he observed blood on Petitioner's face.  ECF Dkt. #26-5 at 1039.  Detective Muszynski, who was called to the scene of the murder, participated in the search of the victim's apartment, and interviewed Petitioner after the murder, testified at trial that Petitioner had blood on his face when she first saw him in the apartment.  ECF Dkt. #18-4 at 398-399; ECF Dkt. #26-6 at 1316-1317, 1330-1331.  Petitioner indicated that the victim had slapped him and caused his nose to bleed.  ECF Dkt. #18-4 at 399.  The forensics scientist from the Ohio Bureau of Criminal Investigation testified that she analyzed samples collected at the crime scene and from the victim's body, and swabs from Petitioner's face, cheek, chin, and from behind his ear.  ECF Dkt. #18-4 at 400-401; ECF Dkt. #26-6 at 1412, 1423-1435.  She testified that the swab of Petitioner's cheek and chin contained DNA from both Petitioner and the victim, with Petitioner being the major contributor, and the victim was the major contributor of the DNA on the swab from behind Petitioner's ear.  *Id.* Lucas County Deputy Coroner Diane Scala-Barnett, MD. testified as to the numerous and severe injuries found on the victim's body and stated that the victim lost a lot of blood

-32-

in the attack which would make it reasonable to expect to find blood spatter on her attacker. ECF Dkt. #18-4 at 402; ECF Dkt. #26-6 at 1466-1485, 1490.

Detective Smith's testimony as to the velocity of the blood spatter had little effect or influence, if any, on the jury's verdict in light of the evidence presented at trial. The testimony from Detective Muszynski, the forensic scientist from the criminal investigation bureau, and the coroner, all confirmed the same testimony as that of Detective Smith that Petitioner had blood on his face. Petitioner has not asserted why or if the velocity testimony from Detective Smith had any impact on the verdict. Accordingly, the Court should find Petitioner's fourth ground for relief to be without merit.

## 4.    GROUND FOR RELIEF NUMBER 5- -CONFRONTATION CLAUSE

In this Ground for Relief, Petitioner asserts that his rights under the Confrontation Clause of the United States Constitution were violated when the trial court admitted the hearsay testimony of Ms. Rivera through the testimony of two police officers and Ms. Rivera's mother. ECF Dkt. #1 at 11. The Ohio appellate court upheld the trial court's admission of the testimony of all three witnesses as follows:

> In his fifth assignment of error, appellant asserts that the trial court erred by allowing into evidence hearsay statements made by the deceased victim, Rivera, through the testimony of Giesige, Poole and Najmi. In support, appellant argues that the admission of Rivera's hearsay statements violated the Confrontation Clauses of the Constitutions of the United States and the state of Ohio because Rivera was not available to testify at trial, and he did not have an opportunity to subject Rivera to cross-examination.

> Generally, the trial court has broad discretion in ruling on evidentiary matters. *State v. Bruce*, 8th Dist. No. 92016, 2009 Ohio 6214, P 54. An abuse of discretion connotes more than a mere error of law or judgment, instead requiring a finding that the trial court's decision was unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 219, 5 Ohio B. 481, 450 N.E.2d 1140.

> An accused's right to confront and cross-examine witnesses against him at trial is guaranteed by both the Sixth Amendment to the United States Constitution and the Ohio Constitution, Section 10, Article I. *City of Toledo v. Sailes*, 180 Ohio App.3d 56, 2008 Ohio 6400, P 12, 904 N.E.2d 543. The initial analysis to be made in determining whether this right has been violated by the admission of out-of-court statements that are not subject to cross-examination "is not whether [the statements] are reliable but whether they are testimonial in nature." *Id.*, P 13, citing *Crawford v. Washington* (2004), 541 U.S. 36, 61, 124 S.Ct. 1354, 158 L.Ed.2d 177.

> In *Crawford*, the United States Supreme Court recognized several categories of statements that are inherently testimonial, including "testimony at preliminary

-33-

hearings, before grand juries, and at former trials, as well as statements elicited during police interrogations." *State v. McKenzie,* 8th Dist. No. 87610, 2006 Ohio 5725, P 5, citing *Crawford, supra* at 52. In addition, the United States Supreme Court identified additional categories that might also be testimonial in nature, including "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *Crawford, supra* at 51. Later, in *Davis v. Washington* (2006), 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224, the Supreme Court expanded its holding in *Crawford* by stating that the Confrontation Clause does not apply to non-testimonial statements that are made for the purpose of enabling police to meet an "ongoing emergency." *Id.,* at 822. However, such statements are testimonial in nature "when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later prosecution." *Id.*

We note initially that Najmi testified at trial as to the extent of Rivera's injuries on both April 27 and May 23, 2006. She also testified that appellant was Rivera's boyfriend at the time of both incidents; however, she never saw appellant hit Rivera. Accordingly, we need not consider whether Rivera made statements to Najmi which were testimonial in nature.

As to Rivera's statements made to police on April 27, 2006, the record contains Poole's testimony that he was responding to a call about a female "stumbling" in the street when he found Rivera, who was bleeding from her nose, mouth and head. Poole stated that he was "trying to ascertain how she got injured" when Rivera told him she was beaten by her boyfriend.

As to Rivera's statements to police on May 23, 2006, the record contains testimony that Giesige and his partner were called to Rivera's apartment because of a domestic disturbance, when they heard appellant say he wanted to bash in Rivera's skull. Immediately upon entering the apartment, they heard Rivera, who was covered in blood and holding appellant at bay with a knife, say "I'm glad you guys came because he would have killed me."

Upon consideration, we find that Rivera's statements to police were not testimonial in nature, since they were made under circumstances that indicate their primary purpose was to obtain police assistance during an emergency situation. However, the determination that Rivera's statements were nontestimonial does not end our analysis, since the out-of-court statements of an unavailable declarant, whether testimonial or nontestimonial, still constitute hearsay, because they were "statement[s], other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid.R. 801(C).

In cases where a hearsay statement is found to be nontestimonial in nature, it may not be admitted at trial unless it "falls within a firmly rooted hearsay exception." *Ohio v. Roberts*, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980); Evid.R. 802. One of those exceptions is an "excited utterance," which is defined as a statement "relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Evid.R. 803(2); *State v. Steele*, 8th Dist. No. 91571, 2009 Ohio 4704, P 42.

In order "[f]or an alleged excited utterance to be admissible, four prerequisites must be satisfied: (1) an event startling enough to produce a nervous excitement in the declarant, (2) the statement must have been made while still under the stress of excitement caused by the event, (3) the statement must relate to the startling event,

and (4) the declarant must have personally observed the startling event." *State v. McKenzie, supra*, at P 29; *State v. Brown* (1996), 112 Ohio App.3d 583, 601, 679 N.E.2d 361. As with all evidentiary rulings, the trial court's determination as to whether a nontestimonial statement qualifies as an excited utterance will not be overturned on appeal absent an abuse of discretion. *State v. McKenzie, supra*, at P 27.

As to the incident on April 27, 2006, Poole testified at trial that Rivera was "confused, upset, like she wasn't really sure where she was at or what was going on" when he found her wandering around on the street. One month later, on May 23, the officers overheard appellant threatening Rivera through the apartment door. Immediately after opening the door, they heard Rivera say appellant would have killed her if help had not arrived. On both occasions, the hearsay statements reported at trial were made spontaneously, without any prompting by police, and without any time for thought or reflection on the part of the declarant. Under such circumstances, the statements have the requisite degree of trustworthiness to qualify as excited utterances. *State v. McKenzie, supra.*

Upon consideration of the foregoing, we cannot say that the trial court abused its discretion by allowing Poole, Giesige and Najmi to testify as to events and statements made on April 27 and May 23, 2006. Appellant's fifth assignment of error is not well-taken.

ECF Dkt. #18-4 at 405-409.

The Confrontation Clause of the Sixth Amendment provides an accused with the right to be confronted with the witnesses against him. *Crawford v. Washington*, 541 U.S. 36, 42, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004); *Pointer v. Texas*, 380 U.S. 400, 406, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965). In *Crawford*, the United States Supreme Court held that the Confrontation Clause bars admission of testimonial statements from witnesses who did not appear at trial unless he was not available to testify, and the defendant had a prior opportunity to cross-examine. 541 U.S. at 53-54. The *Crawford* Court did not comprehensively define "testimonial," but found that the term did, at a minimum, cover "prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." *Id.* at 68.

In *Davis v. Washington*, 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006), the Supreme Court found that "[s]tatements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency." The *Davis* Court noted that it did not attempt to produce "an exhaustive classification of all conceivable statements– or even all conceivable statements in response to police interrogation–as either testimonial or nontestimonial." *Michigan v. Bryant*, —— U.S. ——, ——, 131 S.Ct. 1143, 1155, 179 L.Ed.2d 93 (2011) (quoting *Davis*, 547 U.S.

at 822).  The Court also cautioned that a conversation that begins as an interrogation to obtain emergency assistance could thereafter become testimonial in nature.  *Id.*  The Court indicated that statements made in the course of police interrogation "are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." *Davis*, 547 U.S. at 822.

In the instant case, the state court concluded that the statements of which Petitioner complained were not testimonial.  The appellate court reviewed the testimony presented by Barb Najmi, the victim's mother, who testified that on April 27, 2006, Ms. Rivera was beaten and had "stomp marks" on her head and face.  ECF Dkt. #18-4 at 395.  She further testified that she helped Ms. Rivera move into an apartment with around the clock security in order to get away from Petitioner after another incident on May 23, 2006.  *Id*. at 396.  The appellate court further noted that Ms. Najmi testified that Petitioner was Ms. Rivera's boyfriend at the time of both incidents.  *Id.* at 406.  Ms. Najmi testified on cross-examination that she never saw Petitioner hit her daughter and her daughter had gotten into a fight with another woman on a prior occasion.  *Id.*

The Ohio appellate court cited *Crawford* and *Davis* and held that it was not necessary to determine whether Ms. Rivera made statements to Ms. Najmi that were testimonial in nature because Ms. Najmi merely testified as to the injuries sustained by Ms. Rivera and the fact that Petitioner was her boyfriend at the time of both of the domestic disputes, and she stated on cross-examination that she never saw Petitioner hit Ms. Rivera.  The undersigned recommends that the Court find that such testimony does not implicate the Confrontation Clause as Ms. Najmi testified as to her observations and her actions, and she was subject to cross-examination by the defense.  Moreover, even if Ms. Najmi testified as to statements that Ms. Rivera made to her regarding any abuse by Petitioner, such statements are not testimonial as casual statements to family members are nontestimonial under *Crawford.  See Doan v. Carter*, 548 F.3d 449, 458 (6th Cir. 2008); *United States v. Franklin*, 415 F.3d 537, 545-546 (6th Cir. 2005).

Petitioner also challenges the testimony of Toledo Police Officer Poole, who testified that he was called to a street intersection on April 27, 2006 where he observed Ms. Rivera "stumbling" in

the street and bleeding from her nose, mouth and head.  ECF Dkt. #18-4 at 395.  Officer Poole further testified that Ms. Rivera at that time appeared confused and upset and told him that her boyfriend "Dee" or "Dean" had "beat her up."  *Id*.  Officer Poole further testified that Ms. Rivera was uncooperative in the investigation and refused medical treatment.  *Id*.  Officer Poole also indicated that Ms. Najmi told him that Ms. Rivera's boyfriend was "Dean Thomas."  *Id*.  Ms. Najmi had testified at trial that Petitioner was also known as "Dee Thompson."  *Id*.

Petitioner also alleges constitutional error in the admission of the testimony of Toledo Police Sergeant Giesige, who testified that on May 23, 2006, he responded to a domestic disturbance call and when he arrived, he heard a woman crying inside the residence and a male voice saying: "I own you, bitch.  I'll kill you.  I'll bash your f----g skull in."  ECF Dkt. #18-4 at 395; ECF Dkt. #26-5 at 1149-1154.  Sergeant Giesige testified that the police broke the door down and observed Ms. Rivera covered in blood holding a knife with Petitioner standing directly in front of her.  *Id*.  Sergeant Giesige testified that he heard Ms. Rivera say "I'm glad you guys came because he would have killed me."  *Id*. at 407.

The undersigned recommends that the Court find that the Ohio appellate court's determination that Ms. Rivera's statements to the police in both prior domestic incidents were not "testimonial" is not contrary to or an unreasonable application of clearly established federal law as expressed in *Crawford* and *Davis*.  Clearly, both of the incidents challenged involved ongoing emergency situations.  In both incidents, Ms. Rivera was speaking about "events as they were actually happening," much like the victim in *Davis*.  *Davis*, 547 U.S. at 827.  In addition, a reasonable person would observe that Ms. Rivera "was facing an ongoing emergency" in both situations.  *Id*.  While the April 27, 2006 incident was not as directly threatening as that in *Davis*, since the perpetrator in *Davis* was in the same room as the victim when she initially made the 911 call, police arriving at the street where Ms. Rivera was stumbling and bleeding and a perpetrator not in plain sight presented a threatening and ongoing emergency situation to both Ms. Rivera, the police, and others, since he was not located or apprehended.  The statements by Ms. Rivera in both incidents were necessary in order to resolve the emergency, just as in *Davis*, because telling police on April 27, 2006 that her boyfriend beat her up and stating that police came just in time on May 23, 2006 informed police about the

potentially violent perpetrator that they would be encountering. *Id*.  Finally, as in *Davis*, the formality of the interviews in April and May 2006 is similar to that of *Davis* as Ms. Rivera was stumbling around and bleeding when she talked to police in April 2006 and she was apparently fending off a violent encounter when police broke down the door in May 2006.  Accordingly, the Court should find that the circumstances surrounding the April and May 2006 interrogations "objectively indicate its primary purpose was to enable police assistance to meet an ongoing emergency" and therefore the Ohio appellate court did not act contrary to or unreasonably apply *Crawford* or *Davis* in finding that Ms. Rivera's statements were nontestimonial in nature.

### 5.  GROUND FOR RELIEF NUMBER SIX - INEFFECTIVE ASSISTANCE OF COUNSEL

Petitioner asserts in his sixth ground for relief that he was denied the effective assistance of counsel when trial counsel failed to object to the admission of hearsay statements during trial on the basis of a Confrontation Clause violation.  ECF Dkt. #1 at 11.  In order to prevail on a claim of ineffective assistance of trial counsel, Petitioner bears the burden of showing that counsel's performance fell below an objective standard of reasonableness and counsel's ineffectiveness prejudiced his defense so as to deprive him of his right to a fair trial.  *Strickland v. Washington*, 466 U.S. 668 (1984).  To warrant reversal of a conviction, "the defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Strickland*, 466 U.S. at 694.  Court scrutiny of defense counsel review must be "highly deferential." *Id*. at 689. Decisions that "might be considered sound trial strategy" do not constitute the ineffective assistance of counsel.  *Michel v. Louisiana*, 350 U.S. 91, 101 (1955).  Trial counsel's tactical decisions are not completely immune from Sixth Amendment review, but they must be particularly egregious before they will provide a basis for relief.  *Martin v. Rose*, 744 F.2d 1245, 1249 (6th Cir. 1984).  "Counsel is constitutionally ineffective only if performance below professional standards caused the defendant to lose what he otherwise would probably have won." *United States v. Morrow*, 977 F.2d 222, 229 (6th Cir.1992) (en banc), *cert. denied*, 508 U.S. 975 (1993).

-38-

The Ohio appellate court addressed this claim by Petitioner. ECF Dkt. #18-4 at 422-423. The court found that Petitioner could not establish the deficient performance prong of the *Strickland* analysis because the court had found in Petitioner's prior claims that no errors were committed. *Id.*

The undersigned recommends that the Court find the same in the instant case. The undersigned has already recommended that the Court find that the testimony of Ms. Najmi, Detective Poole and Sergeant Giesige did not violate the Confrontation Clause. Accordingly, counsel could not have deficiently performed by failing to object to the testimony of these witnesses as violative of the Confrontation Clause. Moreover, defense counsel did file motions in limine as to the testimony of these witnesses, requesting that the court bar the prosecution from presenting the testimony of Ms. Najmi, Detective Poole and Sergeant Giesige as to the events of April 27, 2006 and May 23, 2006. because they constituted other acts evidence not related to the crime for which Petitioner was being tried. ECF Dkt. #18-4 at 409. In addition, even if the failure to object to the testimony of these three witnesses on the basis of a violation of the Confrontation Clause was deficient, the undersigned recommends that the Court find that this error did not undermine the reliability of the verdict or otherwise cause the outcome of the trial to be different based upon the evidence outlined by the undersigned in analyzing Petitioner's Ground for Relief Number 2.

## VII. CONCLUSION AND RECOMMENDATION

For the foregoing reasons, the undersigned RECOMMENDS that the Court DISMISS the instant petition in its entirety with prejudice.


DATE: October 30, 2012                    */s/ George J. Limbert*
                                           GEORGE J. LIMBERT
                                           UNITED STATES MAGISTRATE JUDGE


ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days of service of this notice. Fed. R. Civ. P. 72; L.R. 72.3. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. L.R. 72.3(b).